UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | <u>Sentencing Memorandum</u> |
| | ) | |
| PAUL WALCZAK, | ) | Case No. 9:23-CR-80024 |
| Defendant. | ) | |
| _____ | ) | |

      The Defendant, Paul Walczak, willfully failed to pay over $10 million in employment taxes. The Defendant withheld millions from his employees—nurses, doctors, and other healthcare workers—under the pretext of paying their Social Security, Medicare, and federal income taxes. He held that money in trust as their employer and, instead of paying the funds to the Internal Revenue Service ("IRS") as the law requires, he used the funds to enrich himself. When the IRS attempted to collect the taxes through civil means, he not only refused to pay, but reoffended, choosing to maintain his affluent lifestyle rather than comply with the law. When the IRS persisted—refusing to allow him to simply walk away with the millions of dollars he took from his employees under the guise of complying with the tax code—the Defendant tried to hide his personal wealth by starting a new business under the name of his then twenty-year-old daughter.

      He now comes to this Court asking for leniency because he has paid back the trust fund taxes at the 25th hour—after indictment, and after pleading guilty. But awarding a lesser sentence to a defendant simply because he is wealthy enough to pay back millions of dollars after being caught is not justice. Instead, justice requires a sentence that reflects the deliberate, repeated calculations of a criminal who believes the law does not apply to him and who refused to comply with the IRS's attempts to resolve this through civil collections for several years. Accordingly,

the Government requests a sentence of incarceration within the US Sentencing Guidelines range, as calculated by U.S. Probation, and determined by this Court.

## Procedural Background

On February 14, 2023, the Defendant was indicted for failing to pay over trust fund taxes of his business for ten quarters from 2016 through 2019, in violation of 26 U.S.C. § 7202, and for failing to file a personal income tax return, in violation of 26 U.S.C. § 7203.  Dkt. 1, Indictment. After multiple continuances, the case was set for trial for November 18, 2024.  On November 15, 2024, the Defendant pleaded guilty to one count of 26 U.S.C. § 7202 and one count of 26 U.S.C. § 7203, pursuant to a plea agreement, signed on October 11, 2024.  Dkt. 34, Plea Agreement; Dkt. 35, Stipulated Factual Basis.  Sentencing is set for April 11, 2025, before Senior U.S. District Judge Kenneth A. Marra.  Dkt. 41.

On March 6, 2025, U.S. Probation issued an initial Presentence Investigation Report ("PSR") which calculated a total offense level of 26 based on a tax loss of $10,912,334.80 and adjustments for the Defendant's abuse of position of trust and zero-point offender history.  The PSR did not award the Defendant with a reduction for acceptance of responsibility because he tested positive for marijuana use while on bond.  Dkt. 42, Initial PSR ¶¶ 42–50.  On March 20, 2025, and on March 31, 2025, the Defendant—through counsel—objected to the Initial PSR. Specific to the Guidelines calculations, the Defendant argued that (a) only his failure to pay over his employees' trust fund taxes and not his failure to pay his employer's portion of employment taxes should be treated as relevant conduct, (b) he did not abuse a position of trust vis-à-vis his employees or the government, and (c) he did not know marijuana use was illegal.  Letter to U.S. Probation Officer Frances Weisberg, 3-20-25; Dkt. 43–45, Objections and Proposed Corrections and Additions to the Presentence Investigation Report.   On April 4, 2025, U.S. Probation issued

its final PSR, reaffirming the applications of the Guidelines provisions as initially stated, but noting the three issues remain unresolved.  Dkt. 46, PSR; Dkt. 46-1 PSR Addendum.

**Factual Background**

From at least April 2009 to in or about July 2019, the Defendant controlled a web of interconnected healthcare companies, including entities called NuVista, Palm Health Partners, FW Healthcare Investors, and PHP Employment Services ("PHPES") (collectively referred to hereinafter as "the PHP network").  Ownership of the PHP network was divided between the Defendant and various investors through a variety of holding companies; however, the Defendant had sole operational control of the business.  Stipulated Factual Basis ¶ 2; PSR ¶ 10.  PHPES was a Florida limited liability company located in Palm Beach Gardens, Florida.  All of the employees who worked for the PHP network were employed through PHPES.  At its peak, PHPES employed over 600 people and paid over $6 million per quarter in payroll.  Stipulated Factual Basis ¶ 3; PSR ¶ 11.

A.  *Walczak's Misconduct in the Years Preceding the Indictment Period*

The Defendant first failed to pay trust fund taxes[1] for PHPES for the quarters ending June 30, 2011, and December 31, 2011.  IRS collections efforts began in February 2012.  These efforts included meeting with the Defendant and his power of attorney ("POA"), issuing notices about failures to pay and possibilities of levies and liens, and other attempts to get him to bring PHPES current on payments.  In August of 2014, after these efforts failed, the IRS assessed a Trust Fund

---

[1] Employers are required to withhold taxes from their employees' paychecks and make payments to the Department of Treasury through the IRS.  These taxes include federal income tax withholding, Social Security, and Medicare taxes.  These taxes are often referred to as "Trust Fund Taxes" because employers are required to hold the withheld amounts in trust until paid over to the United States.  In addition to Trust Fund Taxes, employers are also required to "match" their employees' Social Security and Medicare taxes.  Together, the employees' portion (*i.e.*, Trust Fund Taxes) and the employers' portion (the matching Social Security and Medicare taxes) are collectively referred to as "employment taxes."

Recovery Penalty ("TFRP") against the Defendant.  The TFRP assessment process involved notices and warnings to the Defendant that the IRS would try to collect the unpaid trust fund taxes from him personally (in addition to attempting to collect from the entity PHPES).  In effect, the TFRP serves as the IRS's attempt to use civil means to get money back from an employer—like the Defendant—after that employer takes those taxes from his employees and converts them to his own use.  Following this first penalty, the Defendant fully paid the assessments against PHPES in or about October 2014.  Stipulated Factual Basis ¶ 10; PSR ¶ 19.

*B. Walczak's Willful Failure to Pay $10 Million in Employment Taxes*

But in the fourth quarter of 2015, the Defendant was again withholding money from PHPES employee paychecks and keeping it.  From January 2016 through September 2016, the Defendant made no federal tax deposits for PHPES's payroll taxes.  During this time frame, the Defendant used over $1 million from a PHP network bank account to purchase a yacht that cost more than $ 2 million; transferred hundreds of thousands to himself—in addition to his $360,000 salary; and used PHP network bank accounts for personal purchases at high-end retailers such as Bergdorf Goodman, Cartier, and Saks.  Stipulated Factual Basis ¶ 12; PSR ¶ 21.  *See also See* Attachment 1 (closing statement for the yacht the Defendant purchased in June 2016); Attachment 2 (sales brochure for the yacht).

On September 20, 2016, Walczak was interviewed by an IRS Revenue Officer to determine whether the IRS should again assess him with a TFRP personally.  The Defendant acknowledged that he exercised full financial control over PHPES.  He admitted that he directed the payment of bills, reviewed the payroll tax returns, knew the withholdings were not being paid, and was the only individual at PHPES who had that level of control.  *See* Attachment 3 (Form 4180, Report of Interview with Individual Relative to Trust Fund Recovery Penalty or Personal Liability for Excise

Taxes).  The IRS began taking collection actions against PHPES and, again proposed TFRPs against the Defendant personally.  Stipulated Factual Basis ¶ 13; PSR ¶ 22.

Following this, the Defendant began negotiating an agreement with the IRS to pay past liabilities he had accrued by failing to pay payroll taxes at PHPES.  The IRS conditioned any agreement on the Defendant staying current on PHPES's payroll taxes, which he did from September 2016 through July 2017.  Stipulated Factual Basis ¶ 14; PSR ¶ 23.

In August 2017, the Defendant again stopped paying payroll taxes at PHPES and made no federal tax deposits until April 2018.  Throughout this period, the Defendant continued to transfer hundreds of thousands of dollars to himself from a PHP network bank account, use the business's accounts for personal expenses, and pay his salary.  Stipulated Factual Basis ¶ 15; PSR ¶ 24.

In March 2018, the Defendant was again interviewed by an IRS Revenue Officer to again determine whether the IRS should assess penalties against him personally.  Again, the Defendant acknowledged that he exercised full financial control of PHPES.  However, negotiations with the IRS failed, as Defendant and his POA failed to provide the IRS with requested financial records for the PHP network and continued to fail to pay trust fund taxes.  Again, the IRS again began taking collection actions against PHPES and proposed assessing the penalty (TFRP) against the Defendant personally.  The Defendant made partial payments of PHPES's payroll tax liabilities for the quarters ending June 30, 2018, September 30, 2018, and March 31, 2019.  The Defendant made no federal tax deposits for the quarters ending December 31, 2018, and June 30, 2019.  Stipulated Factual Basis ¶¶ 16–17; PSR ¶¶ 25–26.

Between 2016 and 2019, as detailed in Attachment A to the stipulated factual basis, Dkt. 35, the Defendant willfully failed to pay $7,432,223.80 in trust fund taxes withheld from the pay of PHPES employees (*i.e.*, the employees' portion of employment taxes).  Over the same period,

PHPES failed to pay $3,480,111 of the employers' matching portion of his employees' FICA taxes (*i.e.*, the employers' portion of employment taxes), for an outstanding tax due and owing of $10,912,334.80.  During that same time period, the Defendant transferred over $2.5 million to himself from PHP network bank accounts, paid himself over $1.1 million in salary, transferred over $1 million from a PHP network bank account to a third party to purchase a yacht, and used PHP network bank accounts to pay for personal expenses and travel.  Stipulated Factual Basis ¶¶ 18–19; PSR ¶¶ 27–28.

*C.  Walczak's Efforts to Conceal his Personal Income and Failure to File Returns*

The PHP network, facing mounting tax liabilities and investor lawsuits, shut down in mid-2019.  By this time, the IRS had assessed millions of dollars owed by TFRP against the Defendant personally.  In response, the Defendant stopped filing personal income tax returns and began hiding his assets and income in the name of nominees.  Stipulated Factual Basis ¶ 20; PSR ¶ 29.  Indeed, on June 5, 2019, as part of the collection action against the Defendant personally, the Defendant completed a Form 433-A, *Collection Information Statement for Wage Earners and Self-Employed Individuals*, on which he reported he was unemployed, had no income, and had relatively few assets apart from his multi-million-dollar home.  Attachment 4.

However, less than three months later, in August 2019, the Defendant created a new entity, NextEra Health Systems, LLC ("NextEra").  On paper, his then twenty-year-old daughter was the 99% nominal owner of NextEra.   In reality, the Defendant had ultimate control of the finances and operations of NextEra, and his daughter was a full-time college student.  Stipulated Factual Basis ¶ 22; PSR ¶ 31.

In 2019 and 2020, the Defendant received from NextEra over $200,000 deposited into a bank account titled in his daughter's name that he controlled, over $225,000 deposited to a bank

account titled in his wife's name, and over $800,000 in payments made directly to third parties for the Defendant's personal expenses, including clothing stores, department stores, and fishing retailers. NextEra's internal financial records categorized these payments to third parties as the Defendant's consulting fees. Stipulated Factual Basis ¶¶ 23–24; PSR ¶¶ 32–33. The Defendant even purchased another boat and attempted to hide it by titling it in his daughter's name.

From 2018 through 2020, the Defendant earned substantially more than the minimum gross income threshold that requires an individual to file individual income tax returns. Nevertheless, the Defendant failed to file the tax returns or pay any taxes that would be due on his income. Stipulated Factual Basis ¶ 25; PSR ¶ 34.

## D. Post-Indictment payments to the IRS

From December 2023 through February 2024—*i.e.*, after he was indicted—the Defendant began sending checks via counsel to the IRS earmarked to pay penalties (TFRPs) assessed against him. These checks, totaling approximately $8 million, paid both the penalties and associated interest. Attachment 5; *see generally* Dkt. 26 (Government Motion in Limine to Exclude Late Payments); Dkt. 28 (Defense Opposition to Government Motion to Exclude); Dkt. 30 (Government Reply regarding the Government Motion to Exclude).

The Defendant claimed to the IRS for most of the preceding decade that he had insufficient funds to pay back all this money which he had withheld from his employees pay and kept. Indeed, he reported to U.S. Probation that his income was approximately $350,000 a year and that he had no assets other than his home equity. PSR ¶ 92. The Defendant has not filed a personal income tax return for tax year 2023 to corroborate that claim. PSR ¶ 103. However, as recently as 2020 he received over $1,000,000 in income diverted from his new business and into accounts in family members' names. Stipulated Factual Basis ¶¶ 23–24; PSR ¶¶ 32–33. Additionally, the

Defendant's 2021 personal income tax return reported $1.1 million from Next Era and his 2022 personal income tax return reported an additional $800,000 from NextEra. PSR ¶ 103.

The Defendant identifies the source of funds used for the restitution payments as unenumerated "ongoing business activities;" PSR ¶ 101, activities that are otherwise unreported to Probation and the Court in lists of Defendant's assets and income, *cf* PSR ¶ 92.

In January 2025—after the Defendant pleaded guilty—the prosecution received[2] an affidavit from the Chief Financial Officer ("CFO") of City Mobile Group ("CMG"), in which the CFO stated that, between Fall 2023 and May 2024, while the Defendant was out on bond, the Defendant defrauded CMG out of millions of dollars in skilled nursing services. The affidavit alleges that the Defendant paid the IRS with funds that the Defendant promised were set aside to repay CMG for services rendered. Attachment 6.

Specifically, according to the attached affidavit, in approximately February 2023, CMG began staffing a healthcare facility called Princeton Place Nursing and Rehabilitation ("Princeton Place"). Unbeknownst to CMG, Princeton Place was managed by the Defendant through a firm called Management MCOA, LLC ("MCOA"). Princeton Place failed to fully pay CMG for nursing staff, and, by the end of 2023, owed CMG approximately $2 million. Princeton Place induced CMG to continue providing services by promising repayment as part of an upcoming sale of Princeton Place to an entity called PureHealth. The Defendant was also a director of PureHealth. On February 1, 2024, the sale of Princeton Place was completed. On February 2, 2024, the Defendant sent the IRS $4.6 million to pay unpaid trust fund taxes which he identified as proceeds of a recently completed business deal. On February 7, 2024, the Defendant induced CMG to continue providing services for Princeton Place in his capacity as an officer of PureHealth. The

---

[2] An attorney for CMG contacted the prosecution after seeing the publicly filed plea agreement.

Defendant represented that money had been set aside to repay CMG as part of the sale which would soon be released and that PureHealth would pay for services bi-weekly as the new owner. As a result, CMG continued to provide additional nursing staffing services based upon the Defendant's representations and promises.  CMG was never paid by the Defendant or his company.

Even accounting for these payments, at the time the Defendant signed the plea agreement, the Defendant owed the IRS $4,381,265.76 in outstanding employment taxes for PHPES. Stipulated Factual Basis, Attachment B.

**Sentencing Guidelines**

The Sentencing Guidelines are "the starting point and the initial benchmark" in determining his sentence.  *See United States v. Matchett*, 802 F.3d 1185, 1194 (11th Cir. 2015) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)); *see also* 18 U.S.C. § 3553(a)(4) (instructing courts to consider the defendants' Guidelines range in determining sentences). Though the Guidelines are only advisory, *see Matchett*, 802 F.3d at 1194, the Eleventh Circuit has recognized the Guidelines provisions for tax offenses are the product of "empirical analysis" and reflect the relevant "legislative history supporting higher sentences for white-collar crime," *see United States v. Snipes*, 611 F.3d 855, 870 (11th Cir. 2010).

*A.  The Base Offense Level is 26*

As stated by Probation, the Defendant faces a base offense level of 26 because the tax loss he caused—including relevant conduct—is $10,912,334.  PSR ¶ 42 (citing U.S.S.G. §§ 2T1.6; 2T4.1(K) (Tax Table)).  The Defendant agrees that through his operation of the PHP Network, he failed to timely pay $10,912,334 in employment taxes.  Defendant contests that the employer's portion of employment taxes that he failed to pay—the employer's matching contributions to Social Security and Medicare—should not be included as relevant conduct.

9

However, the Guidelines state otherwise: "In determining the total tax loss attributable to the offense (see § 1B1.3(a)(2)), all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated."  U.S.S.G. § 2T1.1 n.2; *see also* U.S.S.G. § 2T1.6 n. Background ("Where no effort is made to defraud the employee, the offense is a form of tax evasion, and is treated as such in the Guidelines.").

The employer's portion of the employment taxes that the Defendant failed to pay clearly should be included as relevant conduct, and the Defendant cannot meet his burden to demonstrate that the conduct is clearly unrelated.  The Defendant engaged in a pattern of failing to pay over trust fund taxes for PHPES for many years.  He also failed to pay the employer share of the taxes as part of the same scheme.  The unpaid employment taxes—both employer and employee portions—are reported on the same Form 941, *Employer's Quarterly Federal Tax Return*, and paid via the same electronic payment system.  The IRS's account transcripts do not even distinguish between the employee and employer portion—instead showing only the total unpaid balance.

This clearly constitutes the "same course of conduct or common scheme or plan" that the Guidelines Section 1B1.3 states should be included as relevant conduct.  Indeed, the Guidelines identify as "examples [] illustrative of conduct that is part of the same course of conduct or common scheme or plan: (A) there is a continuing pattern of violations of the tax laws by the defendant . . . [or] (C) the violations involve the same or a related series of transactions."  U.S.S.G. § 2T1.1 n.2.  The Defendant's conduct fits these examples perfectly; he paid employees and simply disregarded all of the corresponding tax obligations that come with such employment, a straightforward, "continuing pattern."  Moreover, the taxes were the taxes he incurred as employer for *the same employees* from *the same company*, clearly a "related series of transactions."

The above Guidelines provisions discuss relevant conduct in tax cases specifically, but the provisions regarding relevant conduct generally also make clear that all of the Defendant's tax crimes from 2016 through 2019 and related to the PHP network should be treated as relevant conduct. The Guidelines define relevant conduct as being part of a common scheme or plan as conduct that is "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purposes, or similar *modus operandi*." U.S.S.G. § 1B1.3 n.5(B)(i). The Defendant engaged in one long-running scheme to defraud the IRS and supplement his lifestyle with unpaid taxes. The victim and the purpose remained the same. A plain reading of the Guidelines mandates that the Defendant be held accountable for the full tax loss in this case, $10,912,234.80. *See, e.g.*, *United States v. Fecondo*, No. CR 22-00011, 2023 WL 7646494, at *3 (E.D. Pa. Nov. 14, 2023) (including employer contribution as relevant conduct under § 1B1.3); *United States v. Weaver*, No. 4:21-cr-3112, 2022 U.S. Dist. LEXIS 214862, at *4 (D. Neb. Nov. 28, 2022) ("There is nothing to negate the showing that the defendant's conduct included both the failure to pay employee and employer payroll taxes. The defendant, quarter-after-quarter and in the same course of conduct, failed to pay over both employer and employee shares of payroll taxes owed to the IRS."); *United States v. Shibilski*, 103 F.4th 1311, 1317 (7th Cir. 2024) (affirming the denial of the acceptance of responsibility adjustment because the defendant contested the tax loss from his 7202 conviction—a tax loss which included the employer's share of payroll taxes).

The Defendant's objection that the employer's portion is not relevant conduct relies on the faulty premise that the failure to pay the employer's portion of employment taxes was not criminal under 26 U.S.C. § 7202. This argument ignores that the failure to pay the employer's portion of employment taxes falls squarely within the gamut of 26 U.S.C. § 7203, a statute that makes it a

11

crime to willfully fail to pay *any* tax.  The Defendant indeed willfully failed to pay the employment taxes of his business—continuing to fund his wealthy lifestyle rather than pay the IRS over multiple quarters from 2016 to 2019.  While the criminal consequences for failing to pay trust fund taxes are understandably more severe than the consequences for the matching employer's portion—there is no question that both are still criminal.

*B.  The Defendant Abused a Position of Trust*

Probation also correctly determined that the Defendant should face a two-level enhancement because he abused a position of trust.  PSR ¶ 45 (citing U.S.S.G. § 3B1.3).  U.S.S.G. § 3B1.3 creates a two-level enhancement for defendants who abuse a position of public or private trust.  "Public or private trust" is defined as a position "categorized by professional or managerial discretion . . . subject to less supervision than employees whose responsibilities are primarily non-discretionary."  U.S.S.G. § 3B1.3 n.1.  The Defendant had discretion over what bills were paid at the PHP network.  He determined whether money was withheld from its employees, and he also determined how much of those withholdings—if any—were paid over to the IRS.  The IRS negotiated installment agreements with him based on his assurances that PHPES would stay current on its payments and held him personally liable for unpaid trust fund taxes.  The Defendant was in a position of trust beyond mere fiduciary status vis-à-vis the IRS in a way someone simply falsifying invoices with a government agency would not be.  *See United States v. Taylor*, 323 F. App'x 806, 807–08 (11th Cir. 2009) (per curiam) (applying the § 3B1.1 enhancement in a § 2T1.6 case); *contra United States v. Garrison*, 133 F.3d 831, 839 (11th Cir. 1998) ("the abuse of trust enhancement applies only where the *defendant has abused discretionary authority entrusted to the defendant by the victim*'; arm's-length business relationships are not available for the application

of this enhancement."); *United States v. Williams*, 527 F.3d 1235, 1251 (11th Cir. 2008) (rejecting § 3B1.1 in a case involving the fraudulent obtaining of grants).

The Defendant argues that he was not in a position of trust vis-à-vis the government.[3]  This argument ignores that the Defendant, "as an employer . . . was placed in a position of trust by the Government.  He was entrusted with collecting, holding, and depositing funds designated in part for Social Security and Medicare and his failure to carry out this responsibility victimized taxpayers."  *United States v. Barringer*, 25 F.4th 239, 256 (4th Cir. 2022) (quoting *United States v. Smith*, 353 Fed. App'x 869, 873 (4th Cir. 2009) (per curiam)).  Defendant attempts to dodge this sound reasoning by reading into the "discretionary" language in the Guidelines a requirement that a defendant have "discretion" regarding whether or not to commit the offense—an impossible reading which would, if followed, practically negate the enhancement.  Instead, the discretion is evident in the Defendant's position as the head of PHP and in his ability to spend the business's funds on himself rather than comply with its legal obligations, including those to the IRS.  *See Barringer*, 25 F.4th at 255 ("Barringer's corporate role and the discharge of her duties sufficiently demonstrate that she conducted J&R's affairs with significant discretion and occupied a position of trust, particularly related to the delinquent payroll taxes, because her position was 'characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)'").

---

[3] The Government is not arguing that the employees are the victims of the offense beyond their status as taxpayers who are generally harmed by the Defendant's crimes against the Treasury. Employees automatically receive credit for taxes that are "actually withheld" even if the moneys are not paid over to the government as promised by the employer.  26 C.F.R. § 1.31-1(a).  Still, the fact that the Defendant took other people's money under the guise of complying with the tax code and then spent it on himself merits consideration under the 18 U.S.C. § 3663(a) factors, discussed below.  *Cf Barringer*, 25 F.4th at 256 (Employers have "both a fiduciary obligation to the IRS to carry out this responsibility [to pay over trust fund taxes], and a fiduciary relationship with the employees of [the company] which carrie[s] the same obligation.") (quoting *Smith*, 353 Fed. App'x at 872).

*C.  Acceptance of Responsibility*

Probation also reports that the Defendant has not clearly demonstrated acceptance of responsibility for the offense despite pleading guilty pursuant to a plea agreement.  It appears that Defendant may not qualify for the adjustment based not only on the marijuana use identified by U.S. Probation, but also his failure to file a 2023 individual income tax return and his refusal to provide to the IRS and Probation an accurate accounting of his income and assets.[4]

The Defendant's conduct arguably shows a continued contempt for the law through the continued concealment of the extent and sources of his income.  Indeed, Defendant has failed to file a personal income tax return—in violation of one of the federal criminal laws to which he has pleaded guilty and for which he now faces sentencing.  Moreover, the source of his ability to pay close to $15 million to the IRS is unclear.  His sudden ability to pay his debts is particularly questionable considering the income and assets that he reported to Probation and the IRS.

Moreover, he provided minimal documentation to support his claimed income and assets. He did not provide his 2021 and 2022 personal tax returns to U.S. Probation—the Government did.  Those returns report that through NextEra he made over $700,000 in 2021 and over $1,1000,000 in 2022, in contrast the $300,000 in income he reported to U.S. Probation.  PSR ¶ 103. He also provided limited, redacted bank statements for accounts held under the names of his family members, *see* PSR ¶ 102, preventing full clarity on his true financial status, even now on the eve of his sentencing for tax crimes.

---

[4] Under the Plea Agreement, the Government is not bound to recommend acceptance of responsibility "if the defendant (1) (fails or refuses to make a full, accurate and complete disclosure to the probation office and the Court of the circumstances surrounding the offense conduct . . . or (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official."  The marijuana use is a state and federal offense and the failure to file a 2023 individual income tax return is a federal offense.

14

D. *There Are No Compelling Justifications for a Departure or Variance*

U.S. Probation appropriately identified that there are no factors that warrant a departure or variance from the applicable Guidelines.  PSR ¶ 119.  Based on the above, and accounting for the Defendant's zero-point Criminal History, U.S. Probation calculates that the Defendant should face a total offense level of 26, a Criminal History Category I, and a Guidelines range of 63–72 months. PSR ¶ 105.  The Guidelines range that the Defendant faces is the result of "empirical analysis of sentences for white-collar crimes."  *Snipes*, 611 F.3d at 870.  The Court should not vary from this Guidelines range absent a compelling justification of equal degree.  *See United States v. Howard*, 28 F.4th 180, 205 (11th Cir. 2022) ("And though the sentencing guidelines are only advisory, a major variance from the guidelines range 'should be supported by a more significant justification . . . .'" (citing *Gall*, 552 U.S. at 50)).

No such compelling justification exists here.  The Defendant caused the exact harm Section 7202 is meant to prevent: using millions of dollars withheld from his employees to fund his business and his lifestyle.  The IRS tried to bring the Defendant into voluntary compliance through the civil process rather than pursue criminal charges.  In response to the efforts of the IRS, the Defendant doubled down and willfully failed to pay and hid his wealth to thwart the IRS's collection efforts.

## 18 U.S.C. § 3553(a) Factors

The Defendant's criminal actions were repeated and deliberate.  He was motivated by greed, and he continued to ignore the law despite years of civil collection activity.  Section 3553(a) instructs the Court to impose a sentence that is sufficient, but not greater than necessary, to satisfy the goals of sentencing.  A Guidelines sentence is indeed necessary to achieve the purposes of sentencing: reflecting the seriousness of attempting to defraud the treasury of over $10,000,000;

addressing the Defendant's commitment to criminal employment tax fraud tactics; and deterring others from similarly pocketing their employees' taxes and flaunting the nation's tax laws in order to expand their business and personally enrich themselves.

*A.  Nature and Circumstances of the Offense*

The Defendant's repeated and deliberate tax offenses merit a sentence within the Guidelines range.  He attempted to cause a tax loss of $10,912,334.80.  That figure alone demands a significant sentence of imprisonment.  In this case, a Guidelines sentence translates to a prison sentence of less than a year of imprisonment for every $1 million stolen.

And the dollar figure alone does not tell the full story of the Defendant's criminal conduct. He committed his crimes by taking taxes from his employees' paychecks and spending those dollars on himself.  These were not last-minute split-second decisions or poor choices made under emotional duress.  Rather, the Defendant had the time to consider his options; indeed, he was reminded of his legal obligations every three months—when  the quarterly Form 941 were due to the IRS and on which he acknowledged he had a tax due—but also by the multiple interviews with the IRS Revenue Officers, and the Officers' repeated attempts to try to bring the Defendant into compliance.  Despite those ongoing collection efforts, the Defendant chose, quarter-after-quarter, year-after-year, to commit his crimes.  Moreover, the conduct spanned years.  Even with time to "cool off," with the time to reflect on his actions, he chose to continue his criminal conduct; continuing to take his employees' withheld taxes and spend them on himself.  In other words, this was not some aberrant decision; rather, this was the Defendant's business model.

The Defendant may argue that he genuinely hoped that the PHP Network would "turn it around" if he could just string together a few positive quarters such that he would be so flush with cash that he could simultaneously pay the $10 million in taxes he had taken and continue to live

his lifestyle. Regardless of whether he earnestly held this belief,[5] it does nothing to mitigate this crime. Americans can spend *their* money as they see fit, including on business ventures. However, they cannot steal *other people's* money—in this case their employees' payroll taxes—to prop up their otherwise failing business ventures. *See Thibodeau v. United States*, 828 F.2d 1499, 1506 (11th Cir. 1987) (per curiam) ("The government cannot be made an unwilling partner in a business experiencing financial difficulties."); *Mazo v. United States*, 591 F.2d 1151, 1154 (5th Cir. 1979) ("The United States may not be made an unwilling joint venturer in the corporate enterprise."); *Davis v. United States*, 961 F.2d 867 (9th Cir. 1992) (affirming conviction in which "The federal government is in effect subsidizing the corporation's recovery by foregoing collectible tax dollars.").

Moreover, the evidence makes clear that the Defendant—like most tax cheats—was motivated by greed. While the Defendant was defying the nation's tax laws, he was spending millions to continue his luxurious lifestyle, chartering private flights, purchasing a yacht, spending at high-end retailers. Indeed, his crimes were marked by deceit, as he tried to circumvent the penalties (TFRPs) assessed against him by using his daughter as a nominee. He opened a new business titled in her name, and from those business accounts directly paid his personal expenses. The Defendant's goal was clear—continue to live his millionaire lifestyle—while alleging he was unable to repay the taxes to the IRS that he withheld from his employees.

A Guidelines sentence is therefore necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

---

[5] The Defendant frequently complained to the collections officer that he was unable to secure funding because of the IRS's attempts to collect the trust fund taxes, including issuing levies. This was not true. Indeed, the purported investor declined to fund the Defendant after learning from a newspaper that the PHP Network was not paying its employees. Attachment 7.

*B. History and Characteristics of the Defendant*

The Defendant pled guilty, agreed to pay restitution, and has no convictions that trigger criminal history points. This background is appropriately reflected in his Sentencing Guidelines calculations. The facts do not merit a sentence below the Guidelines range, and any further reduction would skew the balancing the Court must conduct in imposing a sentence that promotes justice as directed by 18 U.S.C. § 3553.

Putting his criminal history into context, this is not a case where the Defendant's conduct was aberrant or representative of a brief and isolated lapse in judgment. Instead, this "zero-point offender" has been a criminal engaging in criminal conduct for nearly a decade, building his business and supplementing his personal wealth on the back of his employees' taxes. Indeed, the IRS Revenue Officer first referred this matter for criminal investigation only after identifying that (a) three different attempts to recover the trust fund taxes through civil penalties had failed, (b) the Defendant's offers to enter an installment agreement were only "lulling" actions—mere feints at compliance designed to prevent involuntary collection actions, and (c) the Defendant was using the business's funds to supplement his wealthy lifestyle.

The 2014 assessment alone should have served as the warning to get the Defendant into compliance, but he chose to reoffend ten more times, undeterred by a second or even a third civil penalty. In response to the IRS attempting to levy his assets, the Defendant *escalated* his criminal conduct and began using family members to hide his assets. So, while the Defendant will receive a two-point reduction and Criminal History Category I as appropriately accounted for in the Guidelines, his conduct does not warrant any additional credit in the form of a variance or departure.

18

To the extent the Defendant continues to argue his decade-late payment of his tax liabilities negates his criminal conduct, the context of these particular restitution payments merit additional consideration. For years, the Defendant pleaded destitution as his excuse for refusing to pay back to the IRS the trust fund taxes he took. The Defendant continues to claim to have no assets other than his home and income of approximately $300,000 a year. However, following the Indictment and staring down punishment, the Defendant apparently found $8 million between the couch cushions and began to pay back to the IRS the trust fund taxes he stole.

Contrary to his claimed poverty, the Defendant created a business operation under his daughter's name in order to continue to live his millionaire lifestyle while keeping the assets held under his own name minimal so that the IRS could not seize them in order to satisfy his debt. At least a portion of his late payments came from CMG, a business he induced to provide services to his newest business venture. According to CMG, the Defendant represented that money had been set aside to repay CMG, and, as a result CMG continued to provide nursing staffing services. But the Defendant never paid. Post-indictment, the Defendant is apparently operating the newest iteration of his businesses exactly the same way he ran the PHP Network—with money he was not entitled to spend. The only obvious difference is that the Defendant now utilizes new and more elaborately layered shell entities to conceal his conduct from the people he is doing business with and from the government.

Finally, nothing in the Defendant's personal background merits leniency from this Court. During the conduct at issue, the Defendant enjoyed a comfortable salary and a wealthy lifestyle. He had more advantages than most defendants who appear before this Court, and that should be considered by the Court as part of his history and characteristics in determining the appropriate sentence. The Defendant enjoyed a life of financial comforts, filled with benefits that many

Americans can never realistically expect to receive.  But that was not enough for him.  He chose a different path lined with greed and deception.

Multiple courts have cited to the Seventh Circuit's admonition that "[b]usiness criminals are not to be treated more leniently than members of the 'criminal class' just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity . . . .  Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime." *See United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999); *see also United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013); *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018).

Considering the Defendant's financial standing when he committed this crime, his consistent refusal to comply with the law, his attempts to hide his significant personal wealth from the government, and his continued efforts to secure funds through deception, the Defendant should be sentenced to a prison sentence within the Guidelines range.

*C.  The Need to Promote Respect for the Law and Afford Adequate Deterrence*

"[T]axes are the lifeblood of government, and their prompt and certain availability an imperious need." *Bull v. United States*, 295 U.S. 247, 259 (1935).  Criminal tax prosecutions serve not only to punish the violators, but also to promote general deterrence and encourage all taxpayers to abide by the rules and pay their fair share of taxes.  Recent data indicates a tax compliance rate by the general population of approximately 85%.[6]  This means that, while many individuals comply with the law, many others—like the Defendant—shirk their taxpaying obligations.  This

---

[6] Internal Revenue Service, Research Applied Analytics & Statistics, *Tax Gap Projections for Tax Year 2022*, IRS Publication 5869 (Oct. 2024), https://www.irs.gov/pub/irs-pdf/p5869.pdf, at 4.

comes at a real cost.  The "gross tax gap" is estimated to be $696 billion annually.[7]  This is money that cannot be spent on education, health care, the military, or the government's myriad other obligations.  Fitting the Defendant's disregard for his tax obligations into this larger context demonstrates the seriousness of his offenses and the particular need to promote respect for the law.

Nevertheless, criminal prosecutions to curtail noncompliance and outright tax fraud are relatively scarce, reflecting the limited availability of resources necessary to conduct and prosecute such cases.  According to recent figures from the United States Sentencing Commission, there were only 363 prosecutions for tax fraud in fiscal year 2023 (down 27% since fiscal year 2019), which represents a mere 0.57 percent of all defendants sentenced in federal prosecutions.[8] "Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations," the United States Sentencing Commission has stressed in its introductory comments that "deterring others from violating the tax laws is a primary consideration underlying the Sentencing Guidelines."  U.S.S.G., Ch. 2, Pt. T, intro. Comment; *see also Snipes*, 611 F.3d at 872 ("Although the [district court's] discussion about general deterrence was somewhat longer than the discussion of the other factors, its length corresponds with the emphasis the Sentencing Guidelines placed on deterrence in the criminal tax context.").

Indeed, as the Sentencing Commission has recognized, the sentence imposed must provide sufficient punishment in order to deter potential tax offenders: "Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators."  U.S.S.G., Ch. 2, Pt. T, intro. Comment.  A term of imprisonment is necessary in order to achieve such a deterrent effect, given the limited number of tax prosecutions

---

[7] The gross tax gap is defined as the amount of taxes owed that are not voluntarily and timely paid. *Id.*
[8] *See* "Quick Facts: Tax Fraud Offenses", available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick- facts/Tax_Fraud_FY23.pdf.

relative to their incidence. *See generally*, Louis Kaplow and Steven Shavell, Fairness Versus Welfare, 114 Harv. L. Rev. 961, 1225–1303 (2001).

The Fourth Circuit recognized and endorsed this principle in vacating a probationary sentence imposed in a tax evasion case:

> Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

*United States v. Engle*, 592 F.3d 495, 501 (4th Cir. 2010).  And indeed, "[s]tudies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect." Joshua D. Blank, In Defense of Individual Tax Privacy, 61 Emory L.J. 265, 321 (2011).

Essentially, given the relative infrequency with which tax prosecutions are brought in this country, if all a would-be tax cheat has to fear (in the unlikely event that he is caught and prosecuted) is that a sentencing judge would merely slap him with restitution and a nominal jail sentence, then tax fraud is well worth the risk.  But if a taxpayer thought that there was a great likelihood of a meaningful prison sentence for his conduct, then he would likely have second thoughts.  Sentencing the Defendant to a Guidelines term of imprisonment is therefore necessary to provide the required deterrent effect for the general population and demonstrate that tax fraud is met with meaningful consequences, above and beyond the requirement that such taxes be repaid. *See Engle*, 592 F.3d at 502; *see also United States v. Ture*, 450 F.3d 352, 358 (8th Cir. 2006) ("The goal of deterrence rings hollow if a prison sentence is not imposed.").

Deterrence is particularly crucial in a case such as this where the Defendant—an employer—controls the ability to withhold taxes from his employees and pay them over to the

IRS.  Employment taxes can be a tempting source of extra funds for any business officer, whether to provide relief to the company or to line that officer's own pocketbook.  When such officers make the decision to commit tax fraud, they tilt the playing field in their favor, thereby harming the many diligent businesses who faithfully comply with their tax obligations—succeeding or failing on their merits, rather than by cheating the system.  As seen here, employees have no practical method to police their employers, so the threat of criminal consequences provides the only incentive for employers to pay over the taxes as required.  It is therefore critical for this sentence to show that there are real and significant consequences to giving into this temptation.

Moreover, "Defendants in white collar [cases] often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).  This sentence should send a deterrence message to potential tax cheaters that the risk of cheating the public fisc through tax fraud is loss of liberty—prison.  That threat of imprisonment is particularly necessary for business owners to give them something to contemplate when they decide whether to comply with the law. *See also United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014) ("[D]eterrence is an important factor in white-collar cases, where the motivation is greed. . . . [W]e have set aside sentences of little or no imprisonment because they do not constitute just punishment for the offense, do not promote respect for the law, and will not do much to deter similar criminal activity by others.").

Absent such deterrence, other successful Americans with the means and opportunity to enrich themselves at the cost of other taxpayers will cynically conclude that the potential rewards of such criminal activity outweigh the risks of being caught and punished for committing tax fraud. In short, the Defendant is a businessman who made a conscious, calculated, business decision to

shirk his tax obligations.  Give him and other would-be tax cheats a sentence that they have to include in their calculations when deciding whether to risk boosting their bottom line through fraud.  Assure him and others that they cannot gamble with taxpayer money and avoid consequences simply because they agree to repay the funds they took after they got caught.

The sentence should also assure law-abiding taxpayers that they are not credulous rubes for filing tax returns and paying their share of taxes.  Our nation's tax system depends on the voluntary compliance of honest taxpayers.  Here, a significant sentence of imprisonment promotes voluntary compliance by making clear that there are consequences for cheating on taxes and hiding income from the United States.

Part of promoting respect for the law is also maintaining confidence in the justice system. This confidence is particularly undermined in a tax context by the belief that wealthy individuals can pay their way out of prison by simply paying the back taxes that they had evaded or, of equal concern, that less wealthy individuals believe that the wealthy can pay their way out of prison. This perception—even if erroneous—is injurious to the system as a whole.  As the Fifth Circuit has noted: "Nothing is more corrosive to public confidence in our criminal justice system than the perception that there are two different legal standards—one for the powerful, the popular, and the well-connected, and another for everyone else."  *United States v. Taffaro*, 919 F. 3d 947, 949 (5th Cir. 2019).  To maintain confidence in the justice system, it must be the case that nobody can pay his or her way out of jail, and that the public understands that this is in fact the case.  This is all the more true in the case of a successful businessman, such as the Defendant, who engaged in cheating and deceiving the IRS over a period of years, and who has the necessary resources to be able to satisfy the financial penalties imposed by the Court.

Finally, a prison sentence is necessary in order to deter this Defendant specifically from reoffending.  There is a clear history here that civil penalties are inadequate to ensure his compliance.  Moreover, while the mere threat of criminal sanction—the Indictment—prompted the beginnings of his restitution payments, the Defendant has continued to attempt to secure funds through misleading investors.  So, the only means to properly deter Defendant and other would-be tax cheats is to issue a Guidelines sentence of significant imprisonment.

### Restitution

The Defendant has agreed to pay restitution to the IRS of $4,381,265.76—the outstanding amount of the employment taxes he failed to pay as the owner of PHP.  Plea Agreement ¶ 10 (citing Attachment B to the Stipulated Factual Basis).  Pursuant to 18 U.S.C. § 3663(a)(3), the Court should order the Defendant to pay the restitution as agreed to by the parties.[9]

### Conclusion

For years, the Defendant undermined the U.S. tax system and kept for himself over $10,000,000 in employment taxes, including taxes that he withheld from the paychecks of his employees.  When the IRS tried to recover this money from him, the Defendant "doubled down," and concealed assets by using his daughter as a nominee in order to shirk his obligations and maintain his millionaire lifestyle.  These serious crimes deserve serious punishment.  For the aforementioned reasons, the Government respectfully recommends that this Court sentence the Defendant to a within-Guidelines sentence, a four-year term of supervised release, a mandatory special assessment of $120, and restitution payable to the IRS in the amount $4,381,265.76.  Such a sentence is appropriate in this case and consistent with the U.S. Sentencing Guidelines and the

---

[9] The Government is not seeking a fine.  *Cf.* PSR ¶ 103 ("Based on the defendant's present financial situation and considering he has one minor to support, a fine is not recommended in addition to restitution, which is substantial.").

factors enumerated in 18 U.S.C. § 3553(a).

HAYDEN O'BYRNE
United States Attorney


/s/ Brian Flanagan
BRIAN FLANAGAN
District Court No. A5502691
ANDREW ASCENCIO
District Court No. A5502950
ASHLEY STEIN
District Court No. A5502903
Trial Attorneys
Department of Justice, Tax Division
150 M Street, N.E.
Washington, D.C. 20002
(202) 305-7480 (o)
(202) 514-0961 (f)

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2025, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will send a notice of electronic filing to all counsel of record.

/s/ Brian Flanagan
Brian Flanagan
Trial Attorney
U.S. Department of Justice, Tax Division