**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**(WEST PALM BEACH)**

**CASE NO.   23-CR-80024 (KAM)**

**UNITED STATES OF AMERICA,**

      **v.**

**PAUL WALCZAK**

      **Defendant.**

_____/

**DEFENDANT PAUL WALCZAK'S SENTENCING**
**MEMORANDUM AND LETTERS OF SUPPORT OF MITIGATION**

     Defendant Paul Walczak, through counsel, respectfully submits this sentencing

memorandum, which incorporates letters in support of mitigation of punishment, pursuant to

18 U.S.C. § 3553(a) and the United States Sentencing Guidelines ("U.S.S.G.").  Mr. Walczak has

pled guilty to one count of failure to pay over trust-fund taxes in violation of 26 U.S.C. § 7202, a

class D felony (Count 4 of the indictment), and one count of failure to file a personal tax return in

violation 26 U.S.C. § 7203, a class A misdemeanor (Count 13 of the indictment).

     Mr. Walczak accepts full responsibility for his actions.  As will be explained below,

however, he always acted in good faith, cooperating with the Internal Revenue Service after his

business fell behind in meeting its tax obligations due to sudden and unforseeable changes in a

major federal-government healthcare program, and he always intended to pay all outstanding

taxes, albeit late and in contravention of the law.[1]  Significantly, between employment taxes,

_____

     [1]     The Federal Insurance Contribution Act requires employers to withhold Medicare
and Social Security taxes from their employees' wages.  The Internal Revenue Code also requires

penalties, and interest, Mr. Walczak's companies paid the federal government more than $21 million for the tax period running from 2015 to 2019 alone.  After he was forced to shut down his business, Mr. Walczak worked as an industry consultant and closed a deal in March 2020 that enabled to him to make an additional $1 million payment to the IRS, but the COVID-19 pandemic prevented him from finding other consultancy work or otherwise pursuing deals that would have enabled him to make additional significant payments in the short term.  Nevertheless, by the end of 2024, Mr. Walczak had paid all trust-fund-recovery penalties already assessed against him for the quarterly payment periods covered by the indictment.

Moreover, demonstrating extraordinary acceptance of responsibility and good faith, Mr. Walczak has agreed to pay as additional restitution the employer portion of outstanding trust-fund taxes, which totals approximately $3.5 million and is separate from the trust-fund taxes for which he was indicted and for which he otherwise could not be held personally liable as those remain corporate liabilities.

## I.       MR. WALCZAK'S PERSONAL BACKGROUND

Mr. Walczak was born in 1970 in New York to Stephen Walczak and Elizabeth Fago, and was raised in a large, close-knit family.  He was especially close with his maternal grandfather in his early childhood.  Mr. Walczak's parents divorced in 1972, but reunited in 1976 and married again for a short period, during which time Mr. Walczak's sister was born.  Mr. Walczak was

---

employers to withhold federal income taxes from their employees' wages.  Employers hold these taxes in trust for the United States and are required to pay them over to the IRS on behalf of their employees.  Collectively, these withheld taxes are typically referred to as "trust-fund taxes."  An individual with the obligation to collect, to account for, and to pay over withheld trust-fund taxes to the government is called a "responsible person."  Under the law, Mr. Walczak was a responsible person for PHP Employment Services, LLC ("PHPES"), which was the payroll company used by NuVista Healthcare Investors, LLC.

seven years' old at the time of his parents' second divorce, after which his mother remarried several times.  In 1980, Ms. Fago married J. Barton Carver; their son Joseph Fago is Mr. Walczak's half-brother, with whom he is very close.

In his youth, Mr. Walczak played many sports in school, including baseball and track through the tenth grade.  He was also active in fishing, diving, and surfing, hobbies that continued into adulthood.  Mr. Walczak's adolescence from approximately the ages of 14 through 18, however, was particularly difficult.  As detailed in the Presentence Investigation Report, he and his family were required to change residences numerous times to avoid a stalker who was eventually arrested on federal narcotics charges and sentenced to prison.  This was a horrific time in Mr. Walczak's life and is a subject he avoids discussing.  Unsure whether he would be able to continue attending high school due to the turmoil and stress in his home life, Mr. Walczak stopped attending school but took and passed the GED exam.

Mr. Walczak took classes at several different colleges but struggled, eventually concluding that he was better suited to dive into the business world; he thus stopped attending college and joined his mother's nursing-home business.  Although the family business his mother developed helped create an opportunity for what has become Mr. Walczak's career, Mr. Walczak worked his way up from the very bottom.  Indeed, Mr. Walczak started with cleaning and delivery jobs during summers.  His responsibilities eventually increased as he began to gain experience working in accounts payable and receivable; doing field work; learning about housekeeping, building-level operations, billing, and collections; and also doing clinical work.  Eventually, Mr. Walczak began working directly under his mother and discovering and executing the overall vision for the business.  Mr. Walczak's passion for the skilled-nursing-facility field

was motivated by his admiration for his mother's success and leadership in the business, and the enrichment he felt in creating value for communities and in providing opportunities for people. Significantly, Mr. Walczak saw nursing facilities as a point of convalescence for individuals in their "golden years" and strove to transform struggling facilities into vibrant homes that could serve as centers of the surrounding community.

Mr. Walczak has been involved in and has made significant contributions, both personally and through the family's businesses, to various academic and social institutions and other philanthropies. These include, for example, contributing to the Leukemia and Lymphoma Society and spearheading events that helped raise approximately $2 million; contributing to the Florida Atlantic University Research Department; fundraising for the Cleveland Clinic's hospital and the Boy Scouts of America; and organizing turkey drives for those in need in Florida. Through NuVista Healthcare Investors, LLC ("NuVista"), Mr. Walczak routinely organized the purchase of food and beverages, and sponsored speakers for, health fairs at many senior-living communities, and he underwrote an aging-and-wellness conference held at the Scripps Research Institute amphitheater. In fact, the family was responsible for founding the library at the Scripps Institute. Mr. Walczak and his family also worked with Lynn University to subsidize transportation and supplies for families affected by the 2010 earthquake in Haiti, and they raised close to $100,000 for those impacted by the 2004 tsunami in Thailand. In addition, through his close connection to his local churches since childhood, Mr. Walcak participated in church drives and other activities, and in making charitable donations.

## II.     FACTUAL BACKGROUND -- NUVISTA HEALTHCARE

Mr. Walczak became a highly respected owner and operator of skilled-nursing and assisted-living facilities.  He has spent his entire professional life in the nursing-home industry dedicated to improving the quality of patient care while seeking new ways to deliver that care in a cost-efficient manner.  In 1992, he left college to work for Healthcare Acquisition, Inc., a company started by his mother that initially operated four nursing homes in Georgia.  By 1999, Mr. Walczak had worked his way to the position of Chief Executive Officer as he led the company's expansion, and by 2007 the company had a total of over 100 skilled-nursing facilities and senior assisted-living facilities in 13 states.  That year Ms. Fago sold the company.

Following the sale of Healthcare Acquisition, Mr. Walczak applied himself to creating a new healthcare business model that would utilize an innovative business plan that included opening state-of-the-art nursing and assisted-living facilities that embraced patient-centered care environments with private-room designs; were co-located at, or contiguous to, existing medical or academic facilities; and incorporated leading technological advances in digitized patient-care data.  The newly constructed facilities were built both to provide first-rate patient accommodations that themselves would foster a positive healing environment and to deliver high-quality care efficiently.  The business also would eventually incorporate proprietary digital information-sharing technology that allowed for real-time sharing of patient-health data between patients and participating providers and physicians.

To put this plan into action, Mr. Walczak founded NuVista[2] in 2009.  Mr. Walczak's commitment to the project was demonstrated by, among other things, the fact that he and his mother personally invested a total of approximately $18 million in the endeavor.

The Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Stat. 119 (2010), created the Centers for Medicare and Medicaid Services ("CMS"), a branch of which is the Center for Medicare and Medicaid Innovation ("CMMI").  CMMI was created to identify, to validate, and to disseminate information about new care models and payment approaches that would improve the quality of health care provided to Medicare and Medicaid beneficiaries (as well as to participants in the Children's Health Insurance Program) while reducing costs.  This allowed the team at NuVista to embrace and to develop care models that qualified its platform as an industry leader.

In particular, CMS/CMMI implemented new program called Bundled Payments for Care Improvement ("BPCI"), which allowed Medicare for the first time in its history to pay healthcare providers a single payment for all services delivered during a specific episode of patient care rather than separately for each service.  The program designated a recovery period of ninety days that would be covered by Medicare and Medicaid benefits.  NuVista was the first healthcare provider in the nation to be awarded as a skilled-nursing convener contract under the bundle-payment program, and thus also the first to provide a fully integrated care-delivery model based on patient outcome.  Under NuVista's contract, once a patient was discharged from a NuVista facility, regardless of whether the admitting episode was traumatic or elective, NuVista would

_____

[2]       NuVista would serve as the parent company of several other entities in connection with the construction and operation of several state-of-the-art facilities, and the name "NuVista" is at times used herein to refer collectively to this family of companies.

-6-

assume full responsibility for all additional healthcare costs during the balance of the ninety-day period regardless of a given patient's risk profile.  That meant if a patient was discharged after, for example, 21 days (which was the average for patients at NuVista's facilities and nearly half the average stay at a traditional skilled-nursing facility at the time) but required additional care during the balance of the ninety-day coverage period -- whether a two-day respite stay or cardiac surgery followed by extended in-patient recovery -- NuVista would be responsible for all those costs.  NuVista's model thus encouraged restoring patients to full health as quickly as possible by providing the highest-quality healthcare while decreasing government costs significantly.  In short, NuVista earned only what it saved the government.[3]

NuVista's particular bundled-payment program started in 2014 and initially proved extraordinarily successful.  Indeed, Mr. Walczak's business model was demonstrating its potential to revolutionize the nursing-home industry.  Circumstances beyond Mr. Walczak's control, however, created significant problems for the company and its affiliates.  For example, whereas NuVista's business model was based on accepting the highest-risk patients (that is, those in the 99th percentile of risk) in order to receive maximum payments, CMS/CMMI radically changed the program in 2015 by capping provider risk and reward at 20%.  To adjust for this change, NuVista significantly broadened its business model to increase volume, and thereby stabilize revenue, by enrolling hospitals and physician groups in its new digital patient-tracking system through which NuVista served as a fee-for-service manager for these contracted

---

[3]     The risk for NuVista was heightened by the fact that its new care model came with additional costs in the form of, for example, higher staffing levels, the need to hire its own practitioners to manage care, and the need to develop and to implement its own patient-management software.

organizations.  The change added significantly to NuVista's overall operating costs as a 40%

increase in staffing was required, but it appeared as though NuVista had survived the challenges

caused by the drastic change in the payment program.

The relief, however, was short-lived.  CMS itself was overwhelmed by the increase in

provider participation that resulted from its new risk-reward guidelines.  As a result, CMS

delayed all provider payments until February 2017.  Consequently, NuVista did not receive any

payments from hospitals and physician groups utilizing its digitized system for approximately

seventeen months.  NuVista continued to meet its payroll obligations and did not lay off any

employees during the interim, but began falling behind on its tax obligations.

Another devastating blow was CMS's decision later in 2017 to sunset the bundle-

payment program for skilled-nursing facilities, requiring immediate re-capitalization of the

company that included $5 million from Mr. Walczak and Ms. Fago, as well as efforts to forge

new deals with other investors and potential investors in the company.  The additional disarray to

NuVista's operations, including disruption of ongoing construction of a new facility in Jupiter,

Florida, cannot be overemphasized.

Mr. Walczak was transparent with the IRS.  In April 2017, he met directly with IRS

investigators concerning the outstanding trust-fund tax liabilities.  He acknowledged he was a

responsible person, executed a promissory note for the outstanding amounts, and agreed to a

payment plan.  Mr. Walczak then redoubled his efforts to get NuVista back on track and to meet

all tax obligations.  As his rebuilding efforts began to bear fruit, Mr. Walczak secured a letter of

intent from a real-estate investment trust ("REIT") to purchase one of NuVista's facilities for

approximately $62 million.  Mr. Walczak advised the IRS that the pending deal would enable

him to satisfy all outstanding withholding-tax obligations.  Unfortunately, an IRS Revenue

Officer proceeded to issue a summons to the REIT, after which the REIT backed out of the deal.

In the words of Robert Campion, who was the Chief Executive Officer-Administrator at

NuVista's flagship facility in Wellington, Florida, starting in 2010, the strains on NuVista's cash

flow "cannot be understated."  <u>See</u> Exhibit 1 at 20.  During this extraordinarily difficult time,

however,

> Paul made it clear that his priority was to never compromise on
> delivery the care model that we had created at Nu Vista, even if it
> obviously came at a much higher cost point than the typical SNF
> operation. We did not degrade our fresh, healthy food offering, our
> elevated staffing levels, nor our connected-care models driven
> through our own MD and ARNP team. In summary, Paul never
> once asked me, as the day-today manager of the operation, to
> downgrade the product offering in the service of cost-cutting. This,
> despite the obvious notion that we were no longer being paid for
> this top performance by the federal government.
>
> Paul simply insisted that our staff remain whole and our customers
> continue to receive what he felt they deserved - the best post-acute
> care in the nation. His commitment to these things has stayed with
> me since that time and its significance has only grown as I've
> learned of the personal price he paid to continue to provide that for
> as long as he was able.

<u>Id.</u>

Despite Mr. Walczak's continued effort to save the business, which included him and his

mother injecting an additional $8.5 million into the business beginning in 2017, NuVista became

insolvent in February 2019.  Nevertheless, Mr. Walczak never wavered in his continuing efforts

to pay the outstanding tax liabilities, at one point putting his house up for sale.  He was able to

find work as an industry consultant and to close a deal in March 2020 that enabled to him to

make an additional $1 million payment to the IRS, but the COVID-19 pandemic then decimated

the nursing-home industry and prevented him from finding other consultancy work or otherwise pursuing other deals.

As further evidence of his good faith, however, Mr. Walczak continued to make payments toward the outstanding tax liabilities.  Indeed, <u>all trust-fund-recovery penalties imposed on him have been paid</u>.  As of the date of the indictment in February 2023, with respect to quarterly payment periods covered by the indictment, Mr. Walczak had paid $2,428,827 in trust-fund-recovery penalties, leaving a balance due of $4,475,958.  By the end of 2024, including interest that had accrued from the date of the indictment, Mr. Walczak had fully paid the balance of those penalties that were assessed as due and owing -- an additional $6,326,652.  His total pre- and post-indictment trust-fund penalty payments for the periods covered by the indictment were thus $8,755,480.  It also bears noting that, between employment taxes, penalties, and interest, the NuVista family of companies paid the federal government more than $21 million for the tax period running from 2015 to 2019 alone.

Moreover, since the inception of NuVista in 2009 through 2019, despite running into various headwinds not of his making, Mr. Walczak ensured that at all times patient care was not compromised; all NuVista employees were fully paid and their health-benefit plans remained in good standing; and all employee retirement accounts were fully funded.

Lastly, as part of his plea agreement, Mr. Walczak has agreed to pay as additional restitution the employment taxes owed by NuVista's payroll company, PHPES, which are separate from the trust-fund monies for which he was responsible and indicted, and for which he otherwise could not be held personally liable as those remain corporate liabilities.  He agreed to do so as a further demonstration of his good faith and of his acceptance of responsibility.

It bears emphasizing that this is not a case about tax fraud involving lying on tax forms or about tax evasion.  Mr. Walczak worked relentlessly for years trying to salvage his business without compromising patient care or employee compensation and benefits, paying overdue taxes as funds to do so became available.  After the business finally failed in February 2019, he had little income.  He and his wife Patti sold, among other things, Patti's engagement ring and then her wedding ring to continue paying their daughters' tuition.  Their home was in foreclosure proceedings in early 2020, and only days before the foreclosure hearing Mr. Walczak was able to close the March 2020 deal referenced above that allowed the couple to keep their home and for him to make an additional $1 million payment to the IRS for employment-tax liabilities.

### III.    LETTERS OF SUPPORT

Filed as an exhibit to this memorandum are numerous letters of support for Mr. Walczak. They describe a devoted and deeply caring father, brother, and son, and a businessman who not only is deeply admired by those around him, but whose humanity and kindness is reflected in his work.

Patti Walczak, Mr. Walczak's wife of nearly 30 years, writes:

> Paul is my loving partner who helps me see how beautiful and inspirational life can be. He is my soul-mate/best friend, spouse, provider, protector and father of our girls, a son, a brother, a friend, a boss and so many other important personas. He is a pillar of strength for all and many rely on him daily. Paul has a very caring, empathetic, nurturing nature which has everyone in our family looking up to him for guidance and help constantly. Our girls are especially close to their father and love and respect him greatly.

Exhibit 1 at 1.  Patricia offers multiple examples of her husband's generosity toward others, including giving money to those less fortunate and delivering food, toys, and clothing to the local

-11-

orphanage and neighborhoods in need.  In one instance, Mr. Walczak took in his uncle's

adolescent son to live in their home for a year when he was struggling.  He "took him under his

wing and helped him with his studies, personal issues and so much more," enabling him to turn

his life around and to become an accomplished young man.  Id. at 2.

The letters from Mr. Walczak's three daughters illustrate Mr. Walczak's strong character

and unwavering commitment to family and friends.  Abigail writes:

> When I speak of family, I'm referring not just to our immediate
> household, but to our extended relatives, the friends who have
> become family, and even the work family that my father has
> cultivated over the years. My father is the thread that connects all
> these people, the cornerstone upon which multiple communities
> have been built.
>
> . . .
>
> From my earliest memories, my father has been an unwavering
> pillar of strength, not just for me, but for our entire family. His
> resilience is awe-inspiring, a quality I strive to emulate in my own
> life. The strength he possesses isn't just physical or mental - it's a
> profound emotional fortitude that comes from the deep bonds he
> has fostered within our family.
>
> Our family unit is the center of our world, a testament to my
> father's dedication to nurturing and protecting those he loves. This
> commitment extends beyond blood relations; my father's heart is
> big enough to embrace those in need of paternal guidance. A
> poignant example is his relationship with my lifelong best friend,
> Bella. When she lost her father at age 11, my dad stepped in,
> offering her the fatherly support and advice she desperately needed.
> To this day, she wishes him a Happy Father's Day, a reflection of
> the impact he's had on her life.

Id. at 4.  Abigail also describes how her father's character resonates in his work and impacts

those in his nursing facilities' care:

When I enter the office now, it feels like a second home. I work with people who have known my father since before I was born, creating a sense of continuity and deep-rooted relationships. Our company culture, which my father has carefully cultivated, is central to our organization's ethos. It emphasizes care, compassion, and connection - values that mirror those my father has instilled in our family.

Growing up, my father would often take my sister Alex and me to our facilities. We would serve dinner in the dining room and hand out roses to the women on Valentine's Day. These experiences taught us the importance of connecting with those we serve. Now, as I work "boots on the ground" in our Texas facilities, I see firsthand the impact of this culture of care.

Id. at 6.

His daughter Alex Walczak writes of her father:

He is known for his generosity and for always putting others first, and that is exactly what he does-constantly, for our family and his loved ones. He has given us an incredible education, setting us up for success in life, and I could not be more grateful. But I am not the only one who has been touched by my dad's kindness. His generosity extends far beyond our immediate family. He has been like a second father to my closest childhood friends, as well as to the lifelong friends I have made along my college years. When my college roommate and best friend's home burned down in the Palisades fires this year, I came to him with the news and the idea to help out by donating or sending care packages. He immediately wanted to help out by sending her and her family gift cards and contributing to their GoFundMe. He did not even think twice. He is always looking for ways to make a difference, whether in the lives of our family, our friends, or even the strangers he meets every day. Along with my amazingly strong and selfless mother, he has shaped me into the person I am today, and I wouldn't change a single thing about the journey he has taken to show me his true strength-both mentally and physically. He is the most resilient and emotionally intelligent man I know, and for that, he is my rock.

Id. at 8-9.

Addison Walczak, Mr. Walczak's youngest daughter, writes:

-13-

> What my father has done for us as a family is remarkable, but what has shaped me most is who he is as a person and the morals and values he has instilled in me. Beyond stability, he has given us his heart. My father is my greatest inspiration, and that will always remain true. He has taught me the importance of hard work, resilience, and determination-not through his words alone, but through his actions every single day. Whether he is helping me understand my economics studies or having deep conversations about life, he guides me to be someone who strives to do the right thing. His belief in integrity, compassion, and kindness has been at the core of my upbringing. He has shown me that faith and morality are not just beliefs, but ways you live your life. His personal faith in God has inspired me to further my own, and continues to be a guiding light in my life. I can only hope to carry forward the strength of his faith in the way I live my life and treat others.

Id. at 10.  Addison provides an example of her father's support of others in times of need -- namely, when her childhood best friend was struggling as she watched her parents go through a divorce:

> [M]y father stepped in without hesitation. He made our home a safe place for her. She was over most nights of the week, even on school nights, and he always made sure she was fed, had lunches packed, and was cared for sometimes in ways only a father figure can provide. He offered her advice on everything from challenges at home to school and friendships. My father did not have to do any of that. But that is just who he is. He cares deeply and never turns his back on someone who is struggling, even when they aren't his responsibility.

Id. at 11.

Mr. Walczak's mother made sure that her son learned the family business from the ground up:

> My son Paul began working in the business at just 22 years old -- not in an office but on the ground, doing maintenance work, cleaning floors, and delivering medical supplies. He learned the

business from the inside out, eventually becoming a capable and respected leader in our industry.

Id. at 12.  She also speaks to the toll that his case has already taken on the entire family:

> The consequences of his actions have already been devastating: the destruction of our family's generational wealth, the collapse of the business we spent a lifetime building, and, most painfully, the emotional toll on his wife, children, and extended family.
>
> I know that justice must be served.  But I also believe that compassion and context matter.  Paul's actions, while wrong, were not motivated by personal greed, but by a misguided attempt to protect employees and to keep a business alive during extraordinary financial distress. He has paid back far more than the taxes that were due and continues to live with the consequences every day.

Id. at 12-13.

Mr. Walczak's brother, Joseph Fago, also speaks about Mr. Walczak's dedication to his family, writing:

> Our family, raised by a devoted single mother, has always been a close-knit unit, filled with love, support, and unwavering dedication. With an age difference of over 12 years, Paul has taken on the role of protector and guide, even father, consistently looking out for me and encouraging us all to uphold the highest standards in every aspect of our lives.
>
> Growing up without a father was challenging, but having Paul as a strong male figure has been transformative for me. I can hardly imagine where I would be without his influence. He has always carried himself with grace, dressed impeccably, and communicated with eloquence, embodying the qualities of a true gentleman. As a vital role model, Paul has instilled in me the values of integrity, respect, and the importance of hard work, shaping my character in ways I cherish deeply.

Id. at 14.

Friends and professional associates likewise speak warmly of Mr. Walczak's character.

Theodore Babbitt, an attorney in Florida and a close family friend of Mr. Walczak, provides

various examples of Mr. Walczak's kindness and generosity, from paying for guests at, and

raising substantial money for, a Boy Scouts of America fundraiser to engaging in small gestures

to make people feel comfortable and valued.  He writes:

> I write to support leniency in the sentencing of Paul Walczak. This
> is the first time in my practice of well over 50 years that I have
> written a letter asking a judge for leniency for a friend.  I would
> never write such a letter if I did not believe that leniency was
> warranted.
>
>              . . . .
>
> . . . Paul is a generous and kind person. The crime for which he has
> pled guilty is a complete departure from his character. I assure you
> that he has recognized that what he did was wrong and that he is
> deeply remorseful for his actions.
>
>              . . . .
>
> Paul has unique abilities that would allow him to help others if his
> sentence permitted him to create opportunities for the less
> fortunate. I do not believe that incarceration would serve anywhere
> near the benefit that could be derived by permitting Paul to create
> opportunities for advancement, training, and education for others..

Id. at 15-16.

Carmin D. Grandinetti, an attorney who has worked with Mr. Walczak for twenty years as

counsel to his companies and other ventures, writes:

> I have come to know Paul as an exceptional entrepreneur and
> visionary leader with whom throughout this time I have witnessed
> his unwavering dedication to innovation, his fearless approach to
> business, and his ability to inspire those around him.

> Paul embodies the spirit of entrepreneurship, taking bold risks in pursuit of success. While not every venture has resulted in immediate triumph, his resilience and willingness to learn from challenges have ultimately propelled him to great achievements. His leadership in building a 60-facility nursing home chain alongside his mother in the late 1990s and early 2000s is a testament to his strategic thinking and commitment to excellence. Their success culminated in the sale of the company in 2007, demonstrating his ability to create and scale a thriving business.

Id. at 17.  Mr. Grandinetti adds:

> Paul took full responsibility for [his] mistake and worked to raise the necessary funds to satisfy that tax obligation. His determination to make things right speaks volumes about his character—he is a man of integrity who does not shy away from adversity but instead confronts it head-on and takes decisive action. I know from conversations with him today that Paul deeply regrets the decision not to pay those withholding taxes when due but, at the time, had thought the failure would be short lived and the company would be able to make those payments when Medicare finally paid.

Id. at 18.

Robert Campion, a friend and professional colleague for more than fifteen years, praises

Mr. Walczak's commitment to not only his healthcare customers, but also to his family:

> When it comes to committing to healthcare customers' experience and care, as well as supporting/enriching employees with great opportunities, I have never met Paul's peer. His generosity as an employer as well as a healthcare provider are things that have guided me and inspired me since I met him.
>
> . . . I have had the pleasure of knowing Paul and his family outside of the workplace environment. In short, I can say this: a person would be hard-pressed to find a more dedicated family man than Paul Walczak. His love and support for his three daughters has been inspiring and his support of his local church and schools where his daughters attended is incredible.

Id. at 21.

Shannon Morfin, a professional colleague, speaks glowingly of Mr. Walczak's dedication

to his daughters.  Id. at 22.  With respect to Mr. Walczak's professional work, she writes:

> Paul is one of the most intelligent and forward-thinking individuals
> I've met in the healthcare industry. He was relentless in his mission
> to challenge the status quo around value-based pricing and
> improving patient care. Being a pioneer in that space takes more
> than vision-it requires courage, personal sacrifice, and an
> extraordinary amount of conviction. Paul carried all of that with
> him.
>
> As a fellow entrepreneur, I understand how easy it is to become
> consumed by the pressure of building something that aims to
> improve lives. The stress of execution, the weight of responsibility,
> and the challenge of daily fires can sometimes lead to blind spots
> in operational matters. That's not an excuse-it's a reflection of the
> difficult reality faced by many founders trying to bring meaningful
> change to industries entrenched in complexity and regulation. I
> don't discount that mistakes may have been made along the way,
> but I've never believed Paul's actions were rooted in malice. Paul is
> someone who has always had good intentions and wanted to do
> good for others. Unfortunately, when someone is working to make
> meaningful changes in a complex industry like healthcare, their
> best intentions can sometimes lead to unintended consequences.
> The very ambition that drives innovation can also open the door to
> oversight or risk.
>
>     . . . .
>
> I believe that Paul regrets any harm caused-intended or not. I also
> know, without a doubt, that he carries the burden of this situation
> heavily, not just for himself, but for his family.

Id. at 22-23.

C.J. (Chris) Hainsworth, a friend of Mr. Walczak and his family for 35 years, poignantly

shares a story regarding his mother, who, at age 89, had broken her hip and had been

deteriorating physically and emotionally.  When Mr. Walczak learned that Mr. Hainsworth's

mother's health insurance was limited and that the family could not afford self-pay care, Mr.

Walczak immediately called Mr. Hainsworth to advise that he was arranging to move his mother

to the NuVista facility in Wellington:

> He told me not to worry about anything, that he was going to get
> my mother well and that she is his personal VIP guest and not to
> ever worry about her insurance or any expenses. Within a few short
> hours an ambulance was transporting her to his care.
>
> This was the most genuine and compassionate thing ever done for
> my family and it was at a lowest point in my life. Once at Paul's
> beautiful and caring facility my mother thrived and after an 8-week
> therapy and rehabilitation stay she is today doing pretty well still at
> home with us at 97 years of age.
>
> Without any doubt Paul Walczak directly, and with his staff at
> NuVista, saved my mother's life. For this pure and genuine deed of
> compassion I will be eternally grateful to him, the staff and his
> family.

Id. at 24-25.

John Metz, a friend of Mr. Walczak for forty years and a business associate, writes:

> One of the most defining aspects of Paul's character is his tireless
> work ethic. When he joined his mother's healthcare business,
> despite having no prior experience in this area of work, he
> dedicated himself fully to mastering the field. Through long hours
> and relentless effort, he not only became proficient but earned the
> respect of his colleagues and industry peers. This was not a
> privilege handed to him—he proved his worth through sheer
> perseverance and an unyielding drive to succeed. His dedication set
> a remarkable example of what it means to work hard and earn
> one's place, regardless of familial connections.

Id. at 27.

Kaleb Hedrick, a friend and employee of Mr. Walczak for nearly three decades, expresses

his great admiration for Mr. Walczak's character:

> For over 30 years, Paul has been not only a father figure to me but
> also a mentor, employer, and one of my closest friends. His

-19-

> guidance has taught me to face adversity head-on, instilling in me
> the principles of integrity and responsibility. Through his actions,
> he has shown me what it means to be a man who cares deeply for
> his family, friends, and community.
>
> Having the privilege to work alongside Paul for more than 25 years
> has been a transformative experience. Together, we have navigated
> the ups and downs of the healthcare industry, where we strive to
> provide safe and nurturing environments for our aging population.
> Paul has always prioritized the well-being of both our residents and
> employees, demonstrating his commitment to those we serve. Over
> the years, he has created thousands of jobs, continuously seeking to
> uplift those in our community.

Id. at 29-30.  Katie Brinser, who worked with Mr. Walczak as a Human Resources Director

writes:

> To say that Paul is a loyal boss and mentor is selling short his
> absolute commitment to his short and long term associates. Within
> our current organization, there are at least ten individuals who have
> worked alongside Paul for 20+ years, through good times and bad.
> This fact, in itself, shows that he is a leader that people want to
> work for, and this is largely due to Paul's character.  He shows
> unwavering generosity and compassion to his associates. Further,
> he often goes out of his way to assist the team beyond the duties of
> typical workplace association, simply because he sees a need and
> wants to help.

Id. at 31.  She further notes:

> He has been very transparent about his regret with our entire office,
> to both old and new colleagues alike. I believe his willingness to
> take responsibility for his actions by speaking openly about them
> reflect an individual who is worthy of leniency.

Id.

Jerrime Kitsos, Mr. Walczak's brother-in-law and business associate, states:

> Paul looked me in the eye and told me, the healthcare system is
> broken, and we are going to change the way the country looks at
> healthcare, this was in 2011. Paul meant what he said, and he was

on a mission to find a better and different way than it had ever been done before. Yes, there would be personal success for Paul in this, but his mission was always much bigger than himself, as what success Paul had experienced, came in family business.

I have seen firsthand the regret and damage Paul's actions have caused on him, but more importantly his family. Paul's wife and daughters are everything to him and they each adore who he is as a father and man. I am confident that Paul's actions were not deep seeded in malicious intent, but very poor crisis resolution in desperate times. Paul knows there is no justification for those actions, and I am confident this man would never result to any similar actions in the future.

Id. at 33.

Dr. Jeffrey Kotzen, an obstetrician and gynecologist in West Palm Beach for more than 40 years and who has known Mr. Walczak since Mr. Walczak's childhood, writes:

He is a loving spouse and dedicated father. I know his nature is to be hardworking.  As such, I think he is an asset to the community and to his family so I hope that you find it in your heart to give him mercy when considering his sentencing. He is the type of person to have learned from his mistakes already.

Id. at 35.  Ty Morgan, who has been a close friend and business colleague of Mr. Walczak for more than a decade, describes Mr. Walczak's professionalism and generosity:

Throughout our years of working together, Paul consistently demonstrated the highest standards of professionalism, integrity, and compassion. Paul has always been a great leader who did what was right with a huge heart. He is very graciousness [sic] and giving person, always doing the best he can for others. Paul has always been there for me and my family, which I will be forever grateful. He has always been a best friend, mentor and father figure.

Id. at 36.

Ronald J. Collins, who has known Mr. Walczak for more than 30 years in both a personal and professional capacity, describes Mr. Walczak as a "hardworking, family-oriented individual who has contributed positively to both his community and the real estate industry." Id. at 37.  Mr. Collins elaborates on the strength of Mr. Walczak's character:

> Beyond his professional life, Paul is an outstanding husband and a devoted father to three accomplished daughters. He has always prioritized his family's well-being and has instilled strong values of honesty, responsibility, and hard work in his children. His dedication to his family and his community speaks volumes about his true character—one of accountability, generosity, and a sincere desire to do what is right.

Id.

James Bickel, a retired businessman and a friend and neighbor of Mr. Walczak for approximately twenty-five years, speaks highly of Mr. Walczak's generosity, noting how Mr. Walczak periodically brings him meals and cleans his portion of the boat dock.  Mr. Walczak once cleared a fallen oak tree and the considerable debris on Mr. Bickel's property resulting from Hurricane Jean in 2004 while Mr. Bickel was away.  Id. at 38.

Edwin C. Lunsford, Esq., who has known Mr. Walczak for more than 30 years, both professionally and as a friend, writes:

> During my many years of providing legal support to Paul's various business entities, he has consistently demonstrated a commitment to thoroughness and quality in all of his efforts and work product. Maybe most importantly, it was clear from my time with Paul that he is a conscientious and caring human being on a genuine mission to help make the world a better place.

Id. at 39.  Likewise, Dr. David Dodson, an Internal Medicine physician in West Palm Beach who has known Mr. Walczak for the past twenty years, writes that Mr. Walczak is an exemplary son,

husband and father, and has been active in the community and in supporting organizations, such as the Leukemia and Lymphoma Society.  Id. at 40.

IV. **MR. WALCZAK'S SENTENCE**

In light of the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and its progeny, such as Rita v. United States, 551 U.S. 338 (2007), Gall v. United States, 552 U.S. 38 (2007), and Kimbrough v. United States, 552 U.S. 85 (2007), the basic framework for sentencing and the application of the now-advisory Sentencing Guidelines is well settled. The Court must first determine the applicable Sentence Guidelines range, see, e.g., United States v. Crawford, 407 F.3d 1174, 1178 (11th Cir. 2005); United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005), and then undertake its overarching statutory charge to impose a sentence that, considering "the nature and circumstances of the offense and the history and characteristics of the defendant," is "sufficient, but not greater than necessary":

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §§ 3553(a), (a)(l), and (a)(2).  See generally United States v. Talley, 431 F.3d at 786; United States v. Martin, 455 F.3d 1227, 1236 (11th Cir. 2006).

The Court should also consider "the kinds of sentences available . . . any pertinent Sentencing Commission policy statement . . . the need to avoid unwarranted sentence disparities

among similarly situated defendants . . . and, where applicable, the need to provide restitution to any victims of the offense." 18 U.S.C. §§ 3553(a)(3)-(7). As the Supreme Court has summarized, "[d]istrict courts must determine in each case what constitutes a sentence that is 'sufficient, but not greater than necessary,' 18 U.S.C. §3553(a), to achieve the overarching sentencing purposes of 'retribution, deterrence, incapacitation, and rehabilitation.'" Rosales-Mireles v. United States, 585 U.S. 129, 132-33 (2018)(citing Tapia v. United States, 564 U.S. 319, 325 (2011) and 18 U.S.C. §§ 3551(a), 3553(a)(2)). "The weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court." United States v. Williams, 456 F.3d 1353, 1363 (11th Cir. 2006).

In determining an appropriate sentence, a district court may not presume that the Sentencing Guidelines range is reasonable. Gall v. United States, 552 U.S. at 50; Nelson v. United States, 555 U.S. 350, 352 (2009). See also United States v. Hunt, 459 F.3d 1180, 1184 (11th Cir. 2006)(emphasizing that there are "many instances where the Guidelines range will not yield a reasonable sentence.") In addition, a sentence is not presumed to be unreasonable simply because it falls outside the guideline range. Gall v. United States, 553 U.S. at 51.

To be sure, the Sentencing Guidelines range as determined by the Court, although not mandatory, is an important factor for the Court to consider. But the Sentencing Guidelines "do not require a judge to leave compassion and common sense at the door to the courtroom." United States v. Milikowsky, 65 F.3d 4, 9 (2d Cir. 1995). As the United States Supreme Court has noted, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to

ensue." <u>Koon v. United States</u>, 518 U.S. 81, 113 (1996).  <u>See also</u> <u>Gall v. United States</u>, 552

U.S. at 50 (district courts should make an "individualized assessment based on the facts

presented"); <u>United States v. Hunt</u>, 459 F.3d at 1185 (determination of an appropriate sentence

must be made "on a case-by-case basis").

     **a)**     **Offense-Level Computation**[4]

Mr. Walczak's base offense level should be 24 rather than 26.  <u>See</u> Presentence

Investigation Report ("PSR") at ¶ 42; Addendum to the Presentence Report ("PSR Addendum")

at 1-2.  The government argues that loss includes (1) the employee portion of FICA taxes PHPES

was required to withhold and timely pay over to the IRS as charged in the indictment

($7,432,223.80), as well as (2) PHPES's employer portion of the FICA taxes that were not timely

paid to the IRS ($3,480,111).  Mr. Walczak submits that, on the contrary, the employer portion of

the FICA taxes should not be included in the loss calculation.

Whether or not the employer portion of FICA taxes are included in the loss calculation

turns on whether the non-payment or late-payment of such taxes may be considered relevant

conduct under U.S.S.G. § 1B1.3 (Relevant Conduct), which requires consideration of "all acts

and omissions committed . . . or willfully caused by the defendant ... that occurred during the

commission of the offense of convictions . . ."; and "solely with respect to offenses of a character

for which 3D1.2 would require grouping of multiple counts, all acts and omissions described in

subdivisions (1)(A) and (1)(B) ... that were part of the same course of conduct ... as the offense of

conviction."  Section 3D1.2 -- as referenced in § 1B1.3 -- provides that "[o]ffenses covered by

_____

[4]     Pursuant to ¶ 7(b) of the plea agreement, Mr. Walczak has preserved the right to argue that intended tax loss should be limited to his failure to pay over the trust-fund taxes of his employees, that is, the employees' portion of employment taxes.

[USSG. § 2T1.6] are to be grouped under this subsection."  U.S.S.G. § 3D1.2.   An important

limitation on whether conduct may be considered "relevant conduct" is that such conduct itself be

criminal. See, e.g., United States v. Jain, 93 F.3d 436, 443 (8th Cir. 1996)("Relevant conduct for

sentencing purposes must be criminal conduct.").  The government bears the burden of proving

relevant conduct by a preponderance of the evidence. U.S.S.G. § 6A1.3, cmt.; United States v.

Watts, 519 U.S. 148, 156 (1997).

      Here, Mr. Walczak could not be held criminally liable for the company's failure to pay the

employer portion of the withholding taxes.  He could not have been charged with failing to pay

the employer portion under the indicted section, 26 U.S.C. § 7202, which has no application to

the employer's portion of the FICA taxes, because those are not taxes he is "required" to "collect,

account for, and pay over."  While criminal liability under § 7201 may be imposed on an

individual who has perpetrated an affirmative act of evasion connected to his failure to pay the

employer portion of FICA, see Spies v. United States, 317 U.S. 492, 499 (1943)(requiring

affirmative act), or pursuant to § 7206 where, for example, the defendant is shown to be

responsible for a material falsity in a return, there is no evidence that Mr. Walczak perpetrated an

affirmative act of evasion with regard to the employer portion of the FICA taxes, nor is there any

evidence he made a material false statement in any return regarding the employer's taxes.

      Thus, in the absence of proof that Mr. Walczak is criminally liable for PHPES's failure to

pay its share of the FICA taxes, such failure may not be considered relevant conduct in the

calculation of loss.

**b)**     <u>Adjustment for Role in the Offense</u>[5]

The enhancement for abuse of trust pursuant to U.S.S.G. § 3B1.3 does not apply to Mr. Walczak.  <u>See</u> PSR at ¶ 45; PSR Addendum at 2-3.  The enhancement may be applied only if the defendant had a position of trust with respect to the victim of the crime, and here the only victim is the IRS.  <u>See, e.g.</u>, <u>United States v. Garrison</u>, 133 F.3d 831, 837 (11th Cir. 1998); <u>United States v. Williams</u>, 527 F.3d 1235, 1250 (11th Cir. 2008); <u>United States v. May</u>, 568 F.3d 597, 603 (6th Cir. 2009); <u>United States v. DeMuro</u>, 677 F.3d 550, 568 (3d Cir. 2012); <u>United States v. Guidry</u>, 199 F.3d 1150, 1159-60 (10th Cir. 1999).  Mr. Walczak was not in a position of trust vis-à-vis the government.  Moreover, the primary responsibility to pay the employer portion of the taxes due was the company's and not his, and his liability arises only secondarily because he is deemed as "responsible person."  And neither the company itself nor Mr. Walczak in his capacity as a responsible person had any "discretion" whatsoever to withhold payment from the "victim," that is, the government -- discretion being a condition precedent to finding an abuse of trust.  Indeed, a person deemed a "responsible person" is required to turn over trust-fund money and has no discretion whatsoever regarding the mandatory requirement to turn over such funds.

**3)**     <u>Acceptance of Responsibility Under U.S.S.G. § 3E1.1</u>

Mr. Walczak should receive a three-level reduction for acceptance of responsibility as agreed by the parties.  <u>See</u> PSR at ¶¶ 9, 48; PSR Addendum at 3.  As Mr. Walczak explained, he took half of a THC gummy to help him get to sleep after nervousness had kept him awake for two nights prior to his change-of-plea hearing.  He did not realize THC gummies were illegal in

---

[5]     Pursuant to ¶ 7(c) of the plea agreement, Mr. Walczak has preserved the right to argue against this enhancement.

Florida.  Notably, he has been drug-tested on a weekly basis since then without incident.  <u>See</u>

PSR Addendum at 3.  In light of the totality of the circumstances, taking away credit of

acceptance of responsibility is unwarranted.

    **4)**        **<u>The Need to Avoid Unwarranted Disparities Among Similar Offenders</u>**

For the fiscal years 2019 through 2023, there were 182 defendants sentenced nationwide[6]

whose primary Sentencing Guideline was §2T1.6, who were within Sentencing Zone D, and who

had a criminal-history Category of I, after excluding defendants who had received a § 5K1.1

substantial-assistance departure.  Of those defendants, approximately 25% received a sentence of

probation or a combination of probation and non-custodial alternatives.  Of those defendants

sentenced to a term of imprisonment, 77.5% received a sentence of less than two years, while the

remaining 22.5% received a sentence between two and five years.  <u>See</u>

https://ida.ussc.gov/analytics/saw.dll?Dashboard (last accessed April 7, 2025).

For those same fiscal years, there were 14 defendants sentenced in the Eleventh Circuit

whose primary Sentencing Guideline was §2T1.6, who were within Sentencing Zone D, and who

had a criminal-history Category of I, after excluding defendants who had received a § 5K1.1

substantial-assistance departure.  Of those defendants, 36% received a sentence of probation or a

combination of probation and non-custodial alternatives.  Of those defendants sentenced to a

term of imprisonment, approximately 33% received a sentence of less than two years, while the

---

[6]    <u>See, e.g</u>, <u>United States v. Doan</u>, 498 F. Supp. 2d 816, 820 (E.D.Va. 2007)(noting the value of looking nationwide to compare sentences given to similarly situated defendants of similar culpability).

remaining 67% received a sentence between two and five years.  <u>See</u>

https://ida.ussc.gov/analytics/saw.dll?Dashboard (last accessed April 7, 2025).

For those same fiscal years, there were 5 defendants sentenced in the Southern District of

Florida whose primary Sentencing Guideline was §2T1.6, who were within Sentencing Zone D,

and who had a criminal-history Category of I, after excluding defendants who had received a §

5K1.1 substantial-assistance departure.  Of those defendants, 40% received a sentence of

probation.  Of those defendants sentenced to a term of imprisonment, approximately 71%

received a sentence of less than two years, while the remaining 29% received a sentence between

two and five years.  <u>See</u> https://ida.ussc.gov/analytics/saw.dll?Dashboard (last accessed April 7,

2025).

In addition, Mr. Walczak respectfully submits the following precedent for the Court's

consideration:

> • <u>United States v. Williams</u>, No. 22-cr-00154 (M.D. Fl. May 14,
> 2024)(defendant who pled guilty to multiple counts of 26 U.S.C.
> § 7202, and who had caused a tax loss of $435,496, sentenced to
> four years of probation);
>
> • <u>United States v. Mary Estelle Curran</u>, No. 12-80206-CR-
> RYSKAMP (S.D. Fla.)(defendant who pled guilty to two counts of
> 26 U.S.C. § 7206 in connection with her failure to disclose a $47-
> million foreign bank account resulting in a $21-million penalty
> sentenced to 12 months of probation, which was simultaneously
> terminated at the time of her sentencing);
>
> • <u>United States v. Steven Rubinstein</u>, No. 09-CR-60166 (S.D.
> Fla.)(defendant who pled guilty to multiple counts of willful filing
> of a false tax return, and who hid approximately $7 million in
> undisclosed bank accounts that he used to purchase real estate and
> South African Kruggerands, sentenced to three years' probation
> and twelve months of home detention).

• <u>United States v. McCarthy</u>, No. 1:22-cr-00491-NRM-1, 2023 U.S. Dist. LEXIS 93832, at *9-10 (E.D.N.Y. May 30, 2023) (E.D.N.Y. May 30, 2023)(defendant who had failed to pay $612,829 in payroll taxes sentenced to two years' probation and 100 hours of community service);

• <u>United States v. Taffaro</u>, 919 F.3d 947, 949 (5th Cir. 2019)(affirming district court's downward variance from a 27-33-month advisory guideline range to 60-month probationary sentence where defendant pled guilty to several counts of tax evasion and filing false income-tax returns);

• <u>United States v. Cole</u>, 765 F.3d 884,885 (8th Cir. 2014)(affirming district court's downward variance from a 135-168-month advisory guideline range to 36 months of probation where defendant was convicted of conspiracy to commit mail and wire fraud, tax evasion, and conspiracy to commit tax fraud);

• <u>United States v. Tomko</u>, 562 F.3d 558 (3d Cir. 2009)(en banc)(where defendant was convicted of evading $225,000 in taxes and the Guidelines range was 12-18 months, district court's sentence to probation on condition of one year home detention and fine of $150,000 was not unreasonable in part because of Tomko's "minimal criminal record");

• <u>United States v. Augusto DaSilva</u>, No. 1 :15-CR-00439-NLH-1 (D.N.J. May 22, 2017)(defendant who pled guilty to filing a false tax return, and who caused a tax loss of $2,978,774, sentenced to five years' probation, five months of home detention, 1,250 hours of community service, and a $75,000 fine);

• <u>United States v. Igor Olenicoff</u>, No. 07-CR-227 (C.D. Cal. April 14, 2008)(defendant who pled guilty to two counts of willfully filing a false tax return, and who had controlled and hidden assets in undisclosed foreign accounts resulting in tax liability to the IRS totaling $52 million, sentenced to two years' probation);

• <u>United States v. Ashvin Desai</u>, No. 11-CR-846 (N.D. Cal. July 7, 2014)(defendant who was convicted after trial of multiple counts of willfully filing a false tax return, and who hid over $8.4 million in an HSBC India account, sentenced to six months' probation and six months' home detention, where the guidelines called for a sentence between 78-96 months); and

-30-

&bull; <u>United States v. Arvind Ahuja</u>, No. 11-CR-135 (E.D. Wis. Feb. 1, 2013)(defendant convicted following a jury trial of willfully filing false tax return and willfully failing to file a foreign bank account form due to a failure to disclose more than $8.5 million held in bank accounts at HSBC India sentenced three years' probation, three months of home detention, a $350,000 fine, and 450 hours of community service, where the recommended guideline range was 41-51 months' imprisonment).

**5)**     **<u>18 U.S.C. § 3553(a)</u>**

Mr. Walczak makes no excuse for his conduct, and he takes full responsibility for it. There are, however, compelling reasons for the Court to consider exercising its broad discretion by sentencing Mr. Walczak to a period of home confinement.

First, as noted above, this is not a case about tax fraud involving lying on tax forms; nor is it about tax evasion.  Mr. Walczak worked relentlessly for years trying to salvage his business without compromising patient care or employee compensation and benefits, paying overdue taxes as funds to do so became available.  Long before he was indicted, Mr. Walczak began paying outstanding tax liabilities, and he has continued to make significant payments since his indictment.

Second, as part of his plea agreement, Mr. Walczak has agreed to pay as additional $3.5 million in restitution to cover the employment taxes owed by NuVista's payroll company, PHPES, which are separate from the trust-fund monies for which he was responsible and indicted, and for which he otherwise could not be held personally liable as those remain corporate liabilities.  We submit to the Court that doing so demonstrates not just good faith, but extraordinary acceptance of responsibility that supports a downward variance under 18 U.S.C. § 3553(a).  <u>See, e.g.</u>, <u>United States v. Campanale</u>, 665 F. App'x 798, 801 (11th Cir. 2016);

United States v. Blanco, 102 F.4th 1153, 1167-68 (11th Cir. 2024), rehearing en banc denied, 2024 U.S. App. LEXIS 19894 (11th Cir. Aug. 7, 2024), cert. denied, 2024 U.S. LEXIS 4956 (Dec. 9, 2024).

Lastly, we submit that the numerous letters of support submitted on his behalf speak eloquently to Mr. Walczak's character and decency, and to why a non-custodial sentence would be "sufficient, but not greater than necessary" to accomplish the goals set forth in 18 U.S.C. § 3553(a).

In sum, we respectfully submit that the totality of the circumstances warrants that Mr. Walczak be sentenced to probation with a condition of home confinement.

Respectfully submitted,

Raymond R. Granger
*Pro Hac Vice*
Granger & Associates LLC
40 Fulton Street, 17th Floor
New York, New York 10038
Telephone:  (212)732-7000
Facsimilie:  (212)732-7001

/s/ *Dennis G. Kainen*
Dennis G. Kainen
Florida Bar No. 339393
Weisberg Kainen Mark, PL
100 SE 2nd Street, Ste. 2222
Miami, Florida  33131
Telephone:  (305) 374-5544
Facsimile:   (305) 358-8565

-32-

/s/ *Richard W. Levitt*
Richard W. Levitt
Florida Bar No. 247103
Levitt & Kaizer
40 Fulton Street, 17th Floor
New York, New York 10038
Telephone: (212)480-4000
Facsimilie: (212)480-4444

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on April 7, 2025, I filed the foregoing document

electronically via ECF and served a true and correct copy via email on all counsel or others listed

below.

/s/ *Quinten L. Weisberg*
Counsel for Defendant

Brian Eugene Flanagan, Esq.
U.S. Department of Justice, Tax Division
Brian.E.Flanagan@usdoj.gov

Andrew Ascencio, Esq.
U.S. Department of Justice, Tax Division
andrew.ascencio@usdoj.gov

Ashley Joy Stein, Esq.
U.S. Department of Justice, Tax Division
ashley.j.stein@usdoj.gov

Frances Weisberg
U.S. Probation Officer
Frances_Weisberg@flsp.uscourts.gov